UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SABRINA BYRD, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. SILICA COMPANY, | ) |
| | )   4:22-CV-00875-SPM |
| Defendant/Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HALL CONSTRUCTION SERVICES, LLC, | ) |
| | ) |
| Third-Party Defendant. | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Third-Party Defendant Hall Construction Services, LLC's Motion for Summary Judgment. ECF No. 109. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C.§ 636(c)(1). ECF No. 33. The motion has been fully briefed. For the following reasons, the motion will be denied.

**I.   PROCEDURAL BACKGROUND**

This action arises from a vehicle collision that occurred on November 23, 2020. On that date, Third-Party Defendant Hall Construction Services, LLC ("Hall Construction") was asked to transport sand for Third-Party Plaintiff U.S. Silica Company ("U.S. Silica") pursuant to a written contract between the parties. Hall Construction assigned the transportation of the load to Hall Hauling, LLC ("Hall Hauling"). Hall Hauling assigned its employee, James Milstead, to drive the truck that carried the load. While Milstead was driving the truck, it collided with another vehicle,

1

killing the vehicle's occupants. The occupants' children ("Plaintiffs") filed a wrongful death lawsuit in state court against Milstead, Hall Hauling, Hall Construction, Jason Hall (owner of Hall Hauling and Hall Construction), and other individual defendants. In July 2021, the state court entered a partial judgment approving a settlement in which the insurers for certain defendants (including Hall Hauling) agreed to pay their respective remaining policy limits in the amount of $4,065,653.63. Hall Construction Ex. C, ECF No. 110-3, ¶ 11. In December 2021, the state court entered a judgment approving a settlement in which the insurers for certain defendants (including Hall Construction) agreed to pay their respective remaining policy limits in the amount of $2,000,000. *Id.* at ¶ 13.

In August 2022, Plaintiffs sued U.S. Silica in the instant action. In their Amended Complaint, they asserted claims of negligent hiring or selection of an independent contractor, vicarious liability, and breach of a contract to which Plaintiffs were third-party beneficiaries. 2d Am. Compl., ECF No. 17. In March 2025, this Court approved the terms of a Confidential Settlement Agreement between Plaintiffs and U.S. Silica under which U.S. Silica agreed to pay a confidential amount to Plaintiffs. ECF No. 98.

On April 23, 2025, U.S. Silica filed a Second Amended Third-Party Complaint against Hall Construction, seeking contractual indemnification for its losses in the amount of the consideration paid in the Confidential Settlement Agreement and U.S. Silica's costs and attorneys' fees incurred in its defense of Plaintiffs' claims.  ECF No. 107. Hall Construction now moves for summary judgment on this claim, arguing that the contractual indemnity provision in the Agreement does not apply because the undisputed material facts demonstrate that the collision did not arise out of Hall Construction's or Hall Construction's employees' performance or non-performance under the Agreement.

2

II.     FACTS[1]

The Court begins with a discussion of the facts about which there is no dispute. In June 2018, U.S. Silica and Hall Construction entered into a written contract titled, "Non-Exclusive Motor Carrier Agreement" (the "Agreement"). Under the Agreement, Hall Construction ("Carrier") agreed to arrange for the transportation of U.S. Silica's ("Shipper's") loads of sand by motor carriers. Hall Construction Ex. A, Agreement, ECF No. 110-1, at ¶ 7. The Agreement provided that Hall Construction would "only select motor carriers" that met several specific criteria related to safety, insurance, and other matters (the "Section 7 criteria"). *Id.* Specifically, Section 7 provided:

> 7. **BROKERAGE SERVICES.** For all shipments tendered by Shipper to Carrier and accepted by Carrier, Carrier agrees to arrange for the pick-up, transport, and delivery of full truckload (FTL), less than truckload (LTL), and intermodal freight shipments to and from various points in the domestic US, Canada and Mexico, exclusively by motor carriers that hold the proper government authority to perform the requested service(s). Carrier shall not be responsible for packaging, handling, loading or unloading of freight which shall instead be the responsibility of Shipper and/or the carrier. Carrier has the sole right to select the motor carriers used to perform the transportation services, subject to Shipper's right to timely reject the selection of any particular motor carrier as being unacceptable. Carrier shall only select motor carriers that meet the following criteria:
> 
> **A. Authority.** Motor carriers shall be required to maintain proper authority from the Federal Motor Carrier Safety Administration ("FMCSA"), or its Canadian equivalent, and any applicable state agency to perform transportation services in intrastate, interstate and/or foreign commerce.
> 
> **B. Safety.** Motor carriers shall be required to maintain a safety rating from the U.S. Department of Transportation or its Canadian equivalent that is either "Satisfactory" or "Unrated" or "Conditional", and perform transportation of Shipper's shipments in compliance with all applicable safety laws and requirements.
> 
> **C. Insurance.** Motor carriers shall be required to maintain insurance as set forth in Section 10 hereof.
> 
> **D. Carriers' Equipment.** Motor carriers shall be required to provide equipment that is clean, safe, properly maintained, and hazard free, and that meets all applicable governmental regulatory standards and requirements. Motor carriers

---

[1] Unless otherwise specified, these facts are taken from the parties' respective statements of fact and responses. *See* ECF Nos. 113 & 115.

3

shall also be required to provide equipment that is sufficient in quality and quantity to meet Shipper's transportation needs as are or may be contemplated by this Agreement.

**E. Carriers' Drivers.** Motor carriers shall be required to furnish drivers and other operating personnel who are fully qualified, licensed, trained and experienced to properly and safely handle and transport Shipper's property.

**F. Shipment Schedules.** Motor carriers shall be required to perform timely and reliable pick-up and delivery of all shipments in accordance with reasonable schedules communicated in writing by Shipper, its vendors, suppliers and customers to Carrier, and or motor carriers providing the actual, physical transportation of such shipments.

**G. Security Requirements.** Motor carriers shall adhere to the following requirements:

(i) *Background Checks.* In accordance with applicable law, motor carrier is required to conduct background checks of its employees and provide such employees with motor carrier issued employee identification. Drivers must provide photo identification when delivering to or picking up from Shipper sites. No unauthorized passengers are permitted aboard motor carrier's vehicle.

(ii) *Personnel Training.* In accordance with applicable law, motor carrier is to provide general awareness and function-specific security training for motor carrier's employees as appropriate for their job responsibilities. All employees are trained to recognize and report suspicious activities and security breaches.

(iii) *Access Control.* If storage is requested by Shipper prior to tender, access to carrier's facilities where Shipper product is stored shall be secured. Motor carrier shall include security considerations in determining where motor carrier's equipment layover.

(iv) *En Route Security.* As communicated by Shipper prior to tender, motor carrier will give instructions for drivers to minimize risk while en route (e.g., lock vehicle when parked, park in safe and well-lit locations, never leave keys in vehicle, drop trailers in secure gated locations, external inspection of vehicle before resuming travel, etc.).

(v) *Response to Security Threat.* As required by applicable law**,** motor carrier will develop and implement procedures to determine and respond to credible threats. Should such a threat occur, Carrier is to be immediately notified.

Agreement, ECF No. 110-1, § 7.

Section 10 required Hall Construction to keep in force comprehensive automobile liability insurance coverage with a combined single limit each occurrence of $2,000,0000 that would show U.S. Silica as an additional insured. Section 10 also stated:

4

> D. Within ten days from the effective date of this Agreement and any extension term thereafter or any applicable insurance policy renewal dates, Carrier will furnish Shipper with a Certificate of Insurance to evidence insurance companies, coverage and limits acceptable to Shipper as required herein. Such certificate will stipulate that the coverage will not be reduced or canceled without thirty (30) days' prior written notice to Shipper, and shall show Shipper as an additional insured on the Commercial General Liability, Cargo Legal Liability and Commercial Automobile Liability policies. Shipper may increase these minimum insurance requirements at any time by providing Carrier thirty (30) days' advance written notice of the increase. On or before the effective date of the increase, Carrier must furnish Shipper with a revised Certificate of Insurance which evidences the increased limits and complies with the terms of this Section.

Agreement, ECF No. 110-1, § 10(D).

In addition, Section 8 of the Agreement ("Safety and Environmental") provided, in relevant part:

> **8. SAFETY AND ENVIRONMENTAL.**
> A. Carrier shall conduct the services in a safe and prudent manner in compliance in all respects with Shipper's rules in effect from time to time related to health, safety and the environment, as well as all applicable federal, state and local safety and environmental regulations, that apply in connection with the performance of the services hereunder, including without limitation, all applicable federal and state safety and environmental legislation, statues, laws and regulations. Shipper will provide Carrier with any required site-specific safety training.
> B. Carrier further warrants that it will comply with Shipper safety, identification, environmental and health policies and guidelines, and that all employees, subcarriers and agents of Carrier who may visit any of Shipper's business operations have been provided with all appropriate safety training. Shipper may suspend performance of this Agreement for any violation of this Section 8 and further may terminate this Agreement immediately if any such violation may, in Shipper's sole discretion, result in a significant risk of injury or significant damage to property. . . .

*Id.* at ¶ 7-8.

The Agreement also contained the following indemnity clause:

> **9. INDEMNITY.** Carrier agrees to indemnify, save and hold Shipper free and harmless from and against any and all claims, demands, liabilities, damages, losses, judgments, awards, causes of action at law or in equity, including attorneys' fees, for death of or injury to persons or loss of or damage to property, by whomsoever owned or incurred, arising out of Carrier's and/or its employees' performance of or

5

>non-performance under this Agreement, unless caused by the negligence or willful misconduct of Shipper.

*Id.* at ¶ 9.

As discussed above, on or around November 23, 2020, Hall Construction was asked to transport sand for U.S. Silica pursuant to the Agreement. Hall Construction did not have brokerage authority from the Federal Motor Carrier Safety Administration, nor did it have any state-issued authorities. Hall Construction assigned the transportation of a load to Hall Hauling. Hall Hauling maintained carrier authority from the Federal Motor Carrier Safety Administration and the State of Missouri to perform transportation services in intrastate and interstate commerce. Hall Hauling maintained a "Satisfactory" safety rating from the U.S. Department of Transportation. The truck provided by Hall Hauling to transport the load was clean, safe, properly maintained, and hazard-free, and it met all applicable governmental and regulatory standards and requirements.

Hall Hauling and Hall Construction carried comprehensive automobile liability insurance with limits of liability exceeding $2,000,000. However, Hall Construction personnel do not know whether U.S. Silica was provided any certificate of insurance that showed U.S. Silica as an additional insured, and neither Hall Construction nor Hall Hauling can produce such a certificate.

Hall Hauling assigned its employee, James Milstead, to transport the load. Milstead had passed a background check and driving history check on behalf of Hall Hauling. While Milstead was transporting the load, his truck collided with another vehicle, killing its occupants and giving rise to this action and a state court action.

The parties dispute whether Milstead was properly trained and qualified to transport U.S. Silica's shipment. Hall Construction relies on the testimony of Jason Hall, owner of Hall Hauling and Hall Construction, that "James Milstead was fully qualified, licensed, trained and experienced to properly and safely handle and transport the U.S. Silica shipment." Hall Construction Ex. B,

6

Deposition of Jason Hall (March 14, 2025), ECF No. 110-2 ("Hall Dep."), at 61:25-62:5.

On the other hand, U.S. Silica relies on the testimony of Joseph Stidham, whom U.S. Silica characterizes in its brief as an "accident reconstructionist and Federal Motor Carrier Safety Regulations expert." Response, ECF No. 112, at 5.[2] Stidham testified that Milstead was not "properly hired" and "should never have been behind the wheel." Deposition of Joseph Stidham (Oct. 3, 2024), ECF No. 113-3 ("Stidham Dep."), 27:16-18, 24-25; 28:1. He testified that he had not seen background materials or a background investigation for Milstead. *Id.* at 27:18-24. He testified that Hall Hauling "w[as] required by the Federal Motor Carrier Safety Regulation 392.21 to not let him drive because he hadn't completed an application." *Id.* at 28:1-4. He also testified, "Looking through some of the FOIA information and the way this traffic collision occurred, it appears that training was a big issue—or lack of training was a big issue at Hall Hauling." *Id.* at 37:18-22. He testified that based on his analysis of dashcam video of the collision, Milstead "did not perceive a vehicle going slowly in time enough to avoid it, when he certainly had the space and the time to avoid that vehicle." *Id.* at 61:23-62:6. He also reviewed the truck's recorded engine hours and Milstead's logged hours and testified, "Looking through the FOIA information and going back and looking at the data that we had . . . , hours of service for the drivers is an issue." *Id*. at 37:22-25, 78:1-25.

The parties also appear to dispute whether the Agreement required Hall Construction to have some type of operating authority that it did not have. U.S. Silica relies on the testimony of Dr. Thomas Corsi,[3] who testified that Hall Construction "warranted in the agreement" that it had

---

[2] The record contains no evidence of Stidham's background or qualifications.

[3] U.S. Silica characterizes Dr. Corsi as a "transportation expert," Response, ECF No. 112, at 5, which Hall Construction does not dispute. Dr. Corsi's background and qualifications are not in the record.

7

operating authority from the Federal Motor Carrier Safety Administration at the time of the subject accident, and it "did not have that authority." Deposition of Dr. Thomas Corsi (October 22, 2024), ECF No. 113-2, at 37:11-18.

### III. LEGAL STANDARDS

The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Accord, e.g., Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023). The movant "bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact." *Henderson v. State Farm Fire & Cas. Co.*, 113 F.4th 1042, 1049-50 (8th Cir. 2024) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012)). If the movant does so, "[t]he nonmovant must then 'respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Gannon Int'l, Ltd.*, 684 F.3d at 792). A dispute about a material fact is genuine, making summary judgment inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

### IV. DISCUSSION

Hall Construction argues that it is entitled to judgment as a matter of law because "the undisputed facts demonstrate that the collision did not 'arise out of [Hall Construction's]' nor its

8

'employees' performance or non-performance under [the Agreement]," so the indemnity provision in the Agreement does not apply. Mem. Supp., ECF No. 111, at 3. Hall Construction argues that the rules applicable to the construction of contracts apply generally to indemnity agreements, *see Chehval v. St. John's Mercy Medical Ctr.*, 958 S.W.2d 36, 38 (Mo. App. E.D. 1997), and that when a contract uses plain and unequivocal language, it must be enforced as written, *see Lake Cable, Inc. v. Trittler,* 914 S.W.2d 431, 436 (Mo. Ct. App. 1996). Hall Construction argues that "[t]he only rational way to interpret the [Agreement] is to limit its application to liability caused by Hall Construction and not because of negligence by a motor carrier it selected or its driver and not because of negligence on the part of U.S. Silica." ECF No. 111, at 5. Hall Construction further argues that only its own performance or non-performance can give rise to a claim for indemnity, that its performance under the Agreement was to select motor carriers that met U.S. Silica's requirements, and that the undisputed evidence shows that it complied with its work under the Agreement by providing a motor carrier (Hall Hauling) to haul U.S. Silica's load that satisfied all of the relevant requirements under the Agreement. *Id.* at 3.

In response, U.S. Silica does not challenge Hall Construction's interpretation of the Agreement. In other words, U.S. Silica does not dispute Hall Construction's argument that only liability caused by Hall Construction's own performance or non-performance under the Agreement can give rise to a claim for indemnity. Nor does U.S. Silica dispute Hall Construction's position that U.S. Silica is entitled to contractual indemnification only if Hall Construction failed to comply with some provision of the Agreement. Instead, U.S. Silica offers two arguments in opposition to summary judgment. First, U.S. Silica argues that "[t]here is sufficient evidence to support a conclusion that Hall Construction Services, LLC failed to select a motor carrier that satisfied [each] of the six (6) [selection criteria] under Section 7 of the [Agreement]." Response, ECF No. 112, at

9

3. It maintains that "because the jury may conclude that Hall Hauling, LLC did not satisfy at least one (1) of the selection criteria, it may find that the vehicle collision did arise out of Hall Construction Services, LLC's 'performance or non-performance' under the contract and it can be required to indemnify U.S. Silica for its damages arising therefrom." *Id.* Specifically, U.S. Silica argues that Hall Hauling did not satisfy the criteria in Section 7(C), 7(E), and/or 7(G)(ii) of the Agreement. Second, U.S. Silica argues that "[t]here is sufficient evidence to support a conclusion that Hall Construction Services violated additional sections of the [Agreement] related to safety and training." *Id.* at 4. It contends that "[a]s safety and training issues are allegedly causally related in the underlying accident, the jury may find that the vehicle collision did arise out of the additional contract provisions regarding same and Hall Construction Services, LLC can be required to indemnify U.S. Silica for its damages arising therefrom." *Id.* Specifically, U.S. Silica argues that Hall Construction failed to comply with Sections 8(A), 8(B), and 10 of the Agreement.

The Court will address each of U.S. Silica's asserted bases for contractual indemnification below, in three groups: those related to insurance (Sections 7(C) and 10); those related to compliance with safety and environmental regulations (Section 8(A)); and those related to driver qualifications and training (Sections 7(E), 7(G)(ii), and 8(B)).

### A. Whether U.S. Silica's Losses Arose Out of Hall Construction's Performance of the Provisions of the Agreement Related to Insurance (Section 7(C) and Section 10)

The Court first addresses U.S. Silica's argument that there is evidence that the vehicle collision arose from Hall Construction's violations of Section 7(C) and/or Section 10 of the Agreement, both related to insurance. Section 10 required Hall Construction to keep in force comprehensive automobile liability insurance coverage with a $2,000,000 combined single limit for each occurrence. It also required Hall Construction to furnish U.S. Silica with a certificate of insurance showing U.S. Silica as an additional insured within ten days from the effective date of

10

the Agreement. Section 7(C) required motor carriers to maintain insurance as set forth in Section 10. It is undisputed that Hall Hauling and Hall Construction carried more than $2,000,000 in coverage. However, there is no evidence that Hall Construction nor Hall Hauling provided U.S. Silica with a certificate of insurance that showed U.S. Silica as an additional insured.

The Court will assume, for purposes of the instant motion, that the evidence is sufficient to support a finding Hall Construction failed to comply with both Section 10 and Section 7(C) because neither Hall Construction nor Hall Hauling provided a certificate of insurance to U.S. Silica naming U.S. Silica as an additional insured. However, U.S. Silica does not explain how the vehicle collision could possibly have "aris[en] out of" either Hall Construction's failure to provide a certificate of insurance naming U.S. Silica as an additional insured or Hall Construction's selection of a motor carrier who failed to provide such a certificate. Nor does U.S. Silica explain how any of its losses could possibly have arisen out of these alleged violations. U.S. Silica does not suggest, for example, that there are any funds it should have received but did not receive because it was not provided a certificate of insurance naming it as an additional insured. Because there is no evidence that  U.S. Silica had any losses arising from the failure to provide U.S. Silica with a certificate of insurance naming it as an additional insured, Hall Construction's failure to comply with Section 7(C) and/or Section 10 cannot form the basis for any contractual indemnification claim.

B. **Whether U.S. Silica's Losses Arose out of Hall Construction's Performance of the Provision of the Agreement Related to Compliance with Safety and Environmental Regulations (Section 8(A))**

Section 8(A) provides, in relevant part, that Hall Construction "shall conduct the services in a safe and prudent manner in compliance in all respects with . . . all applicable federal, state and local safety and environmental regulations, that apply in connection with the performance of the

11

services hereunder, including without limitation, all applicable federal and state safety and environmental legislation, statues, laws and regulations." Agreement, ECF No. 119-1, § 8(A). U.S. Silica argues that there is evidence that Hall Construction did not comply with this provision because it is undisputed that Hall Construction did not have brokerage authority from the Federal Motor Carrier Safety and Administration and did not have any state issued authorities. It also relies on the testimony of Dr. Thomas Corsi that Hall Construction warranted in the Agreement that it had operating authority from the Federal Motor Carrier Safety Administration at the time of the subject accident, but it did not have that authority. Hall Construction argues that the contract did not require Hall Construction to have brokerage authority and that U.S. Silica advances no theory that the absence of brokerage authority contributed to the vehicle collision in this case.

Even assuming, *arguendo*, that there is sufficient evidence to show that Hall Construction was required by the Agreement to have brokerage authority (and/or some other type of operating authority) and did not have that authority, the Court agrees with Hall Construction that this is immaterial to the contractual indemnification claim asserted here. U.S. Silica offers no evidence or argument to suggest that whether or not Hall Construction had brokerage authority (or any other type of operating authority) had anything to do with safety, or that the lack of any authority contributed in any way to the vehicle collision or to any other aspect of U.S. Silica's losses. U.S. Silica cannot show its losses arose from the lack of this authority. Because there is no evidence that U.S. Silica had any losses arising from the lack of brokerage or other authority, Hall Construction's failure to comply with Section 8(A) cannot form the basis for any contractual indemnification claim.

### C. Whether U.S. Silica's Losses Arose Out of Hall Construction's Performance of the Provisions of the Agreement Related to Driver Safety and Qualifications

Finally, the Court addresses U.S. Silica's argument that there is evidence that the vehicle

12

collision arose out of Hall Construction's performance or non-performance of the provisions related to the qualifications and/or training of Hall Hauling driver James Milstead. This argument concerns three provisions of the Agreement. First, Section 7(E) required that motor carriers selected by Hall Construction "be required to furnish drivers and other operating personnel who are fully qualified, licensed, trained and experienced to properly and safely handle and transport Shipper's property." Agreement, ECF No. 119-1, § 7(E).  Second, Section 7(G)(ii) required that motor carriers selected by Hall Construction "provide general awareness and function-specific security training for motor carrier's employees as appropriate for their job responsibilities" and that employees be "trained to recognize and report suspicious activities and security breaches." Agreement, ECF No. 119-1, § 7(G)(ii). Third, Section 8(B) required "that all employees, subcarriers and agents of [Hall Construction] who may visit any of [U.S. Silica's]  business operations have been provided with all appropriate safety training." Agreement, ECF No. 119-1, § 8(B). The parties offer the same arguments and cite the same evidence with respect to these three provisions, so the Court will analyze them together.

Hall Construction argues that the undisputed facts show that it complied with each of these provisions. It relies on the testimony of Jason Hall that Milstead "was fully qualified, licensed, trained and experienced to properly and safely handle and transport the U.S. Silica shipment." It also relies on the undisputed evidence that Milstead passed a background check and a driving history check on behalf of Hall Hauling. On the other hand, U.S. Silica argues that there are genuine issues of fact remaining regarding whether Milstead was fully trained and qualified. U.S. Silica relies on the testimony of Joseph Stidham, whom it describes as an accident reconstructionist and Federal Motor Carrier Safety Regulations expert. Stidham testified that Mr. Milstead was not "properly hired," that he "should never have been behind the wheel," that "lack of training was a

13

big issue at Hall Hauling," and that "hours of service for the drivers is an issue" at Hall Hauling.

Based on the current record, the Court finds that genuine issues of material fact regarding Milstead's training and qualifications preclude entry of summary judgment at this time. Hall's testimony supports Hall Construction's position that Milstead was fully qualified and trained to safely transport U.S. Silica's load. That testimony, if credited by the jury, would support a finding that Hall Construction complied with its obligations under Sections 7(E), 7(G)(ii), and 8(B), such that U.S. Silica would not be entitled to contractual indemnification. On the other hand, Stidham's expert testimony, if credited by the jury, would support a finding that Milstead was *not* fully qualified and trained to safely transport U.S. Silica's load, such that Hall Construction failed to comply with one or more of these provisions of the Agreement.[4] The assessment of the credibility of these witnesses is for the jury, not the Court. *See, e.g., Henderson v. Munn*, 439 F.3d 497, 504 (8th Cir. 2006) ("[I]t is not [the court's] function to remove the credibility assessment from the jury.") (internal quotation marks omitted). Additionally, in light of Stidham's testimony suggesting that Milstead's driving contributed to the vehicle collision, a jury could reasonably find that the vehicle collision (and U.S. Silica's related losses) "ar[ose] out of" Hall Construction's failure to comply with the provisions of the Agreement related to driver training and qualifications.

The Court acknowledges that each party has suggested that the other party's evidence on the topic of driver training and qualifications is inadmissible. However, neither party has properly raised or briefed any objection to the admissibility of this evidence. U.S. Silica's objection to Hall's testimony consists of nothing more than a bare citation to Rule 56(c)(2),[5] and Hall Construction's

---

[4] U.S. Silica's argument appears to be significantly stronger with respect to Section 7(E) than 7(G)(ii) or Section 8.

[5] Rule 56(c)(2) states, "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

objection to Stidham's testimony is unsupported by any legal authority at all.[6] The Court has concerns about the admissibility of both Hall's testimony and Stidham's testimony.[7] However, the Court finds that it would be inappropriate to exclude either witness's testimony on the current sparse record. The parties may renew their objections to the admissibility of these witnesses' testimony through properly supported motions in limine in advance of trial.

## V.  CONCLUSION

For all of the above reasons, the Court finds genuine issues of material fact remain regarding the question of whether U.S. Silica's losses arose out of Hall Construction's performance of the provisions of the Agreement related to driver safety and qualifications. Accordingly,

**IT IS HEREBY ORDERED** that Third-Party Defendant Hall Construction Services, LLC's Motion for Summary Judgment (ECF No. 109) is **DENIED**.

---

[6] Based on the arguments it makes, it appears that Hall Construction may be challenging the admissibility of Stidham's opinion evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Under the Case Management Order, motions to exclude expert testimony pursuant to *Daubert* were due by May 27, 2025. Hall Construction did not file any motion seeking to exclude Stidham's testimony.

[7] Hall appears to be offering his opinions. The current record contains no evidence addressing whether Hall's opinion is "rationally based on [his] perception," as is required for lay opinion testimony to be admissible. *See* Fed. R. Evid. 701(a). Nor does it contain any evidence that Hall is "qualified as an expert by knowledge, skill, experience, training, or education," as is required for expert opinion testimony. Fed. R. Evid. 701. Additionally, the record does not indicate what information Hall had about Milstead's training and qualifications or about what training and qualifications a driver of U.S. Silica's load should have received.

U.S. Silica offers Stidham's opinions as an expert. The current record contains no evidence addressing whether Stidham has any "knowledge, skill, experience, training, or education" on the topic at issue. *See* Fed. R. Evid. 702. Additionally, a review of Stidham's deposition testimony raises questions about whether Stidham's opinions are based on "sufficient facts or data" to be admissible under Rule 702(b). In particular, it is unclear whether Stidham was given sufficient information to evaluate Milstead's qualifications and/or training.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2025.